## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THADDEUS J. NORTH** ) | |
| 529 Candlewood Lake Road ) | |
| Brookfield, CT 06804 ) | |
| ) | |
| **and** ) | |
| ) | |
| **MARK P. POMPEO** ) | |
| 129 Park Avenue ) | |
| Weymouth, MA 02190 ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil No.** |
| ) | |
| **SMARSH, INC.** ) | |
| 851 SW 6TH Avenue, Suite 800 ) | |
| Portland, OR 97204 ) | |
| ) | |
| and ) | |
| ) | |
| **FINANCIAL INDUSTRY** ) | |
| **REGULATORY AUTHORITY,** ) | |
| **DEPARTMENT OF ENFORCEMENT** ) | |
| 1735 K. Street, NW ) | |
| Washington, DC 20006 ) | |
| _____ ) | |

### COMPLAINT

Plaintiffs, Thaddeus J. North ("Mr. North") and Mark P. Pompeo ("Mr. Pompeo"), by counsel, hereby set forth their Complaint against Defendants, Smarsh, Inc. ("Smarsh") and the Financial Industry Regulatory Authority ("FINRA"), Department of Enforcement ("Enforcement") for relief from injuries caused by Defendants' tortious, unlawful, and conspiratorial actions towards them.

## JURISDICTION

1.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331; resolution of the underlying claims herein involves application of the Securities and Exchange Act 1934 as amended, 15 U.S.C. §§ 78a–78pp (2012) ("Securities Exchange Act") and regulations promulgated in support thereof, and the Electronic Communications Privacy Act as amended, 18 U.S.C. §§ 2510–2521 (2012) ("ECPA").

2.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332: Plaintiff North is an individual whose residence and business addresses are in Connecticut; Plaintiff Pompeo is an individual who resides in Massachusetts; Defendant Smarsh is a corporation registered in New York and whose principal business address and headquarters are in Portland, Oregon; and Defendant FINRA is a private not-for-profit corporation and self-regulatory organization formed in Delaware on September 3, 1936 as the Investment Bankers Conference Inc., was renamed the National Association of Securities Dealers, Inc. in or about 1939, was renamed FINRA in a restated Certificate of Incorporation on July 30, 2007; and was registered in the District of Columbia where it maintains its headquarters and principal place of business; Plaintiffs each seek damages in excess of $75,000.

3.      The Court has long-arm jurisdiction over Smarsh pursuant to D.C. Code § 13-423(a)(3) because:

> … acts undertaken within the forum by one co-conspirator in furtherance of an alleged conspiracy may subject a non-resident co-conspirator to personal jurisdiction under the long-arm statute. [Because] conspiracy jurisdiction under [D.C. Code § 13-423 (a) (3)] presumes that "[p]ersons who enter the forum and engage in conspiratorial acts are deemed to `transact business' there 'directly'; [and] co-conspirators who never enter the forum are deemed to `transact business' there 'by an agent.'" So long as any one co-conspirator commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal jurisdiction over all members of the conspiracy."

*Jung v. Association of American Medical Colleges*, 300 F. Supp. 2d 119, 141 (D.D.C. 2004).

4.      This Court also has supplemental jurisdiction over any state law claims raised herein pursuant to 28 U.S.C. § 1367.

## PARTIES

5.      Plaintiff North was the Chief Compliance Officer  ("CCO") and registered with Southridge Investment Group, LLC ("Southridge") from February 2008 to August 2011 and Ocean Cross Capital Markets, LLC ("Ocean Cross") from August 2011 to January 2013.[1]

6.      Plaintiff Pompeo was registered as a securities broker with Southridge from January 2010 to September 2011 and subsequently registered with Ocean Cross from September 2011 to September 2012; his business for the firm involved sales and marketing.[2]

7.      Defendant Smarsh is engaged in interstate commerce, advertising, and contracting throughout the United States as a third party vendor of archival services; it has seven worldwide locations; between 2005 and 2014 its business increased from 500 to over 20,000 customers.

8.      Smarsh advertising claims that it "archives everything" and that it is "the leading provider of archiving & compliance solutions for companies in regulated and litigious industries", *see* http://www.smarsh.com/about-us; Smarsh contracts with the Southridge and Ocean Cross firms promised that Smarsh would provide regulatory compliance archiving and compliance services according to the requirements of the Securities Exchange Act.

---

[1] Mr. North and approximately half of the registered representatives from Southridge became registered with Ocean Cross when Southridge closed after concerns for branding and business reputation arose in the context of investigations regarding hedge fund management by an owner of the Southridge firm. Mr. North was subject to two disciplinary actions in which the electronic communications evidence and expert testimony were excluded; both actions are on appeal.

[2] After an interview under oath in which he was shown tampered with emails to suggest securities laws violations, Mr. Pompeo was accused of FINRA rule violations in an August 16, 2013 correspondence pursuant to FINRA Examination No. 20120305375; he contends that the tampered with emails were used to fraudulently induce him to enter into an Agreement, Waiver and Consent ("AWC") with FINRA on or about October 18, 2013.

9.      Defendant FINRA is a not-for-profit corporation; it is authorized by the Maloney Act of 1938 that amended the Securities Exchange Act and is registered with the Securities and Exchange Commission ("SEC") as a national securities association pursuant Section 15A of the Securities Exchange Act, 15 U.S.C. § 78*o*-3. *Nat'l Ass'n of Sec. Dealers, Inc. v. SEC,* 431 F.3d 803, 804 (D.C. Cir. 2005). As a corporation, FINRA is obligated to adhere to all state and federal laws and constitutions in the conduct of its business even though "[b]y virtue of its statutory authority, [FINRA] wears two institutional hats: it serves as a professional association, promoting the interests of its members, and it serves as a quasi-governmental agency, with express statutory authority to adjudicate actions against members who are accused of illegal securities practices and to sanction members found to have violated the Securities Exchange Act or ... [SEC] regulations issued pursuant thereto." *Id.* (internal citations omitted). *See also* Securities Exchange Act, 15 U.S.C. § 78*o*-3(b)(7). FINRA is authorized to fine, discipline, and remove its members.

10.     Non-party LK was an independent contractor and securities broker registered by Southridge between July 1, 2009 and mid-September 2011; she was registered by Ocean Cross from September 2011 through December 2012.

11.     Non-party TC is a statutorily disqualified person according to an order on or about November 6, 2007 as a result of NASD Disciplinary Proceeding 2006004494201.

12.     Non-party William E. Schloth ("Schloth") was the Chief Executive Officer ("CEO") and General Securities and Financial Operations Principal at both Southridge and Ocean Cross at all times between July 1, 2009 and July 1, 2013.

13.     Non-party Andrew J. Perkins is a Chief Hearing Officer for FINRA; he appointed non-party David R. Sonnenberg as Hearing Officer to preside over an administrative proceeding

involving the Southridge firm; he appointed Carla Carloni as Hearing Officer to preside over administrative proceedings involving Ocean Cross; Mr. Perkins was the Hearing Officer and Mr. Sonnenberg was FINRA's Director of Enforcement in the 2006 NASD proceeding involving TC.

14.     Non-parties Senior Regional Counsels Mark J. Fernandez and Sarah J. Belter and Principal Examiner Leslie D. Jackson are employed in the FINRA New Orleans District office; Mr. Fernandez was co-prosecutor in the 2006 NASD proceeding involving TC.

15.     Non-parties Senior Regional Counsels Paul J. Taberner and Bonnie McGuire and Examiner James McKennedy are employed in the FINRA Boston District Office.

16.     Non-party Southridge Technology Grp LLC ("Southridge Tech")[3] is a Connecticut limited liability company that provides "24/7"remote and in-person computer sales, services and support to dental and medical offices, law firms, real estate firms, and other small businesses in and around the company's four (4) offices located in Brookfield, Ridgefield, and East Berlin, Connecticut and Tarrytown, New York. During 2009 and through 2012 Southridge Tech's offices were located at 26 Ridgefield Road, Danbury, Connecticut. Southridge Tech has never operated offices in New York City or in Massachusetts. Southridge Tech allegedly provided an email server and hosted email services for the Southridge firm and its employees.

17.     Non-party web.com hosted the email services for the Ocean Cross firm and its employees from mid-September 2011 through July 2013.

18.     Non-party Stephen D. Marsh is CEO of Smarsh. Non-party Smarsh employees James "Jimmy" Douglas and Robert Sherman, and Smarsh General Counsel Bonnie Page, participated in FINRA proceedings involving the Ocean Cross and Southridge firms.

_____

[3] Southridge Tech is not related to Southridge Investment Group, LLC except for the technology services provided to Southridge until the firm withdrew its registration with FINRA.

## SUMMARY OF CLAIMS

19.     Messrs. North and Pompeo contend that Smarsh knowingly and fraudulently contracted to provide regulatory compliance archiving and compliance services, which services require that an archive server physically attach to the email server of the email system for the client; however, despite its contractual promises and advertisements, Smarsh had neither the intent nor the ability to provide the required archiving for Plaintiffs' (and co-workers') electronic communications files and provide related compliance services. Instead, Smarsh gave instructions to Plaintiffs that altered settings to purposefully and unlawfully cause Plaintiffs' electronic communications to be intercepted and redirected in real time to a private collaborative network not owned, controlled, or operated by Smarsh, which allowed immediate access to the files by multiple FINRA employees, without warrant or like authority. For its part, FINRA accessed the network to obtain Plaintiffs' (and co-workers') intercepted and redirected electronic communications, tampered with them to suggest securities laws violations, and misrepresented them as actual email and like messaging that had been archived according to SEC rules.

20.     All files allegedly archived by Smarsh, and delivered to FINRA for subsequent delivery to Mr. North on or about October 30, 2013 and on or about February 13, 2014, contain an Internet Protocol ("IP") address that falls within a range of IP addresses reserved specifically for private networks, according to the American Registry of Internet Numbers ("ARIN") and Internet Assigned Numbers Authority ("IANA").  *See* Whois-RWS for IP 172.17.161.22[4], attached as Exhibit 1.

21.     All files allegedly archived by Smarsh and delivered to FINRA for subsequent delivery to Mr. North between October 30, 2013 and January 8, 2015 contain false positives,

---

[4] This IP address is found in metadata to a March 8, 2010 email Message-Id: 4B956A880019C18000AB2E5B.

which cannot and do not exist in a lawfully and properly archived electronic record, but which compelled Plaintiffs to examine the records and thereby uncover Defendants' illicit scheme, described *supra* in ¶ 19; further, the content of the electronic communications and the metadata to those communications prove that the files did not come from the servers that sent senders' electronic communications or that received the recipients' electronic communications.

22.     The facts also show that between December 2005 and July 2013 Smarsh never physically entered the premises of and did not attach to the email servers for Southridge or Ocean Cross; the facts also show that at FINRA's bidding, between November 5, 2014 and September 3, 2015 Smarsh witnesses gave conflicting statements and testimony to fraudulently conceal and cover up Defendants' actions and omissions.

23.     Messrs. North and Pompeo contend that no FINRA, NASD, MSRB, or SEC rule authorizes the Defendants' collaborated and conspiratorial actions, which:

   a.   defrauded Plaintiffs into paying for archival services as contracted and promised by Smarsh that were intentionally neither delivered nor attempted;

   b.   converted, lost, and destroyed their original electronic communications files, circumventing the preservation requirements of 17 C.F.R. § 240.17a-4;

   c.   corrupted, altered, tampered with, and reconstructed Plaintiffs' electronic communications files that were not converted, lost, or destroyed to create the appearance of compliance failures FINRA accused Plaintiffs of committing;

   d.   violated the ECPA, 18 U.S.C. §§ 2511, 2515, and 2518, and like statutes of Connecticut and Massachusetts; and

e.  committed mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1346, and

1349 for carrying out a scheme involving the unlawful, contemporaneous

interception, and conversion of digital data, and deprivation of honest services.

24.   Defendants' conspiracies and actions were and are too elaborate and inclusive in design and execution to have not been preconceived; likewise, Defendants' conspiracies and actions were and are too resource intensive to have been developed and implemented solely to affect a small group of persons, including Plaintiffs.

25.   As corporate entities, Defendants and their employees are subject to federal and state laws and constitutions; "[no person] is this country is so high that he is above the law." *United States v. Lee*, 106 U.S. 196, 220 (1882); neither Defendant nor their agents are privileged to violate criminal, civil, and constitutional laws and assert immunity for those violations.

26.   Defendant corporations are liable to Plaintiffs for the actions of their officers, agents, and employees according to principles of *respondeat superior*.

## STATEMENT OF FACTS

27.   NASD Rule 3010(a)–(d) imposes legal duties on broker-dealers to have written supervisory procedures for preserving written and electronic communications; specifically, 17 CFR 240.17a-4(f)(2)(ii)(A) requires that copies of all electronic communications be preserved "exclusively in a non-rewriteable, non-erasable format." *Id*.

28.   Electronic communications include emails, chats, instant messages, and like messaging without regard to the delivery media being a personal computer ("PC"), laptop, Smart phone or iPhone, tablet or iPad, Blackberry or other such handheld devices; the electronic record of an email is the original and official federal record, according to *Armstrong v. Executive Office of the President, Office of Admin.*, 1 F. 3d 1274 (D.C. Cir. 1993).

29.     Regulatory and interpretive notices published by SEC and FINRA do "not require that a particular type of technology or method be used to achieve the non-rewriteable and non-erasable requirement in paragraph (f)(2)(ii)(A)"; however, any electronic storage systems vulnerable to the "ability to overwrite or erase records stored on these systems makes them non-compliant with Rule 17a-4(f)." *See e.g.* SEC Release No. 34-47806 effective May 12, 2003.

30.     SEC and FINRA recognize that it is an accepted industry practice for firms to contract with third party vendors to preserve electronic communications according to 17 CFR 240.17a-4(f)(2)(ii)(A) and to maintain electronic copies of relevant compliance activities.

31.     On or about December 23, 2005, Defendant Smarsh entered into a contract with Greenfield Capital Markets, LLC ("Greenfield") containing promises respecting the electronic records archiving services Smarsh would provide to the brokers, including Plaintiffs, who were registered with Greenfield, which changed its name to Southridge in 2006; on March 29, 2007 and August 12, 2011 Smarsh entered into contracts to provide archival services for the brokers registered at Southridge and Ocean Cross, respectively. *See* Smarsh contracts, marked Exhibit 2.

32.     On or about February 9, 2006, Smarsh CEO Stephen D. Marsh executed a letter for Southridge while operating as Greenfield, which letter was provided to the NASD, FINRA's predecessor, and which makes specific promises and representations about the archiving services Smarsh would provide:

> Greenfield Capital Partners LLC has contracted with Smarsh, Inc., an independent third party, for messaging compliance services. We are currently managing components of their email services, which includes [sic] archiving all messages sent to or originating from the greenfieldcapital.com domain. Messages are automatically captured prior to delivery and are permanently saved in a Write-Once-Read-Many format.

> The electronic storage medium:
> • Preserves records in a non-re-writable, non-erasable format.
> • Verifies automatically the quality and accuracy of the storage process

- Serializes the original and duplicate units of storage media, and time-date the information place in the ESM
- Has the capacity to download indexes and records in an acceptable medium

Additionally, in reference to SEC Rule 17a-4 (f)(vii) Smarsh is a third party ("the undersigned"), who has access to and the ability to download information from the member's, broker's, or dealer's electronic storage media to any acceptable medium under this section. …

Smarsh also acknowledges that the electronic records and data maintained are the sole property of its broker customer ….

*See* February 9, 2006 Letter executed by Stephen D. Marsh, attached as Exhibit 3.

33.     At no time did any Smarsh employee physically come to any Southridge, Ocean Cross, or Southridge Tech location to install or set up any archiving equipment or software; all communications between Smarsh and Southridge Tech, Plaintiffs, and employees of Southridge and Ocean Cross were by telephone, email, facsimile transmission, mail, or interstate carrier.

34.     Although Bloomberg, LP ("Bloomberg") maintains a permanent archive or "vault" for its customers' electronic communications, FINRA required Southridge and Ocean Cross employees to arrange for Smarsh to archive Bloomberg messaging for the firms' registered brokers subscribing to Bloomberg; this requirement necessitated additional set-up instructions, a user ID, and a password for daily file transfer protocol ("FTP").

35.     Between July 1, 2009 and mid-October 2009, and allegedly for the purpose of archiving the Southridge employees' emails, Smarsh employees in the Smarsh New York office communicated instructions by email to Southridge Tech administrator, Tom McCay, for email server set-up; Smarsh employees also sent instructions to registered representatives at Southridge for changing settings on their PCs, Bloomberg terminals, iPhones, Blackberries and other communication devices.

36.     On September 9 and 14, 2009, and allegedly for the purpose of archiving, Smarsh corresponded by email with Mr. North and Southridge employee, LK, to coordinate permissions necessary for Smarsh to download by secure FTP daily Bloomberg communications.

37.     Between October 16 and 19, 2009, and allegedly for the purpose of archiving, a Smarsh Support Technician emailed "Smarsh IP" ranges for LK's Bloomberg control panel.

38.     Smarsh provided instructions to Mr. Pompeo, who worked in Massachusetts for Southridge and then Ocean Cross, for setting up his PC and Blackberry device allegedly for the purpose of archiving.

39.      On or about October 25, 2011 Smarsh notified its customers of a Smarsh "network upgrade" and emailed a revised set of IP ranges for communication device settings.

40.     At various times, Smarsh instructed Plaintiffs and other firm employees to send "Test" emails from their communication devices to Smarsh, allegedly to confirm that wired line and wireless communications were being archived; the Smarsh Support Team tested LK's Bloomberg access on or about October 20, 2009; Smarsh employees performed tests between February 12, and 19, 2012 and on March 23, 2012 for Mr. Pompeo's wired and wireless devices.

41.     Believing that Smarsh had archived the Southridge and Ocean Cross firms' electronic communications and maintained records of his and others' compliance actions as represented, upon request of FINRA Enforcement, Mr. North contacted Smarsh by telephone and by email on or about June 20, 2010 to request that Smarsh deliver a copy of the firms' archived electronic communications in .pst format directly to FINRA; Smarsh allegedly sent two or more CDs/DVDs with Smarsh labeling by United States mail or interstate commercial carrier to FINRA Enforcement Examiner Jackson.

42.     FINRA Examiners Jackson and McKennedy created and printed from the electronic communications files in the private collaborative network and used them to conduct interviews under oath of Messrs. North, Pompeo, and Schloth in April 2012 and LK in September 2011 and August 2012.

43.     FINRA Enforcement for both the Boston and New Orleans Districts initiated legal proceedings against Mr. North in July and August 2013, alleging failures of compliance with FINRA rules, including email compliance and supervision.

44.     Enforcement in the Boston FINRA Office informed Mr. Pompeo of intended charges against him, alleging failures of compliance with FINRA rules respecting information contained in email communication(s) and distributed to the public.

45.     On or about October 30, 2013 and in January 2014, FINRA New Orleans and Boston Regional Counsels, respectively, delivered sets of CDs/DVDs alleged to contain exact copies of the archival emails allegedly captured by Smarsh along with other electronically stored information ("ESI"); FINRA sent the discs by Federal Express and contemporaneously sent passwords for the CDs/DVDs by a separate email communication; in total, FINRA sent seventy or more CDs/DVDs to Mr. North between October 30, 2013 and January 8, 2015.

46.     Some CDs/DVDs delivered by FINRA were inaccessible and had to be replaced.

47.     Because Mr. North was familiar with the volume and content of the Southridge and Ocean Cross emails, even when replacement discs were accessed, he noted that (i) the CDs/DVDs contained electronic communications for many but not all firm members,[5] (ii) there was a substantially large discrepancy in the number of emails produced by FINRA and the number of emails that Mr. North believed should have been produced, (iii) there were multiple

---

[5]  Also provided were scans of documents, reports, and manuals obtained from the firms and copies of testimony given in the interviews of the Southridge and Ocean Cross employees.

copies of many of the same emails in various formats within of the CDs/DVDs, and (iv) *all* of the ESI contained anomalies known as false positives.

48.    Because over 85% of the emails contained on the CDs/DVDs were purportedly Bloomberg communications and all production emails appeared to demonstrate false positives, the relevant Bloomberg vault for the period of July 1, 2009 through December 2012, was obtained and downloaded by secure FTP on April 14, 2014 to compare the contents of the Bloomberg vault to records allegedly archived by Smarsh; the Bloomberg vault contained over 212,000 emails and a few thousand chats in XML format for the period of July 1, 2009 through December 2012.

49.    By comparison, and as confirmed in an email on or about July 31, 2014 from FINRA Regional Counsel Belter, the electronically stored records for Southridge employees delivered on or about October 30, 2013 contained 59,714 files in .pst format.

50.    Similarly, the CDs/DVDs from FINRA containing email records for Ocean Cross employees for the period of October 1, 2011 through April 30, 2012 contained fewer records than the known Bloomberg records of one employee for the comparable period.

51.    From March 2014 to October 2014, To The Rescue Texas owner and technician, Andy Thomas assisted with accessing the CDs/DVDs, inventorying the data, identifying the false positives, and communicating with Bloomberg and Smarsh technicians about possible causes of the discrepancies observed; in a declaration dated October 6, 2014, Mr. Thomas made the following observations about the allegedly archived data on the CDs/DVDs from FINRA:

   a.    tens of thousands of emails contained language added to sender line descriptions;

   b.    the substitution or insertion of inaccurate sender and recipient names;

   c.    formatting and font differences;

13

d.  time and time zone differences;

e.  incomplete message content and misspellings;

f.  multiple copies of the same Bloomberg messages but in different formats i.e., .eml, .pst, .pdf, and .msg, even though the native form of the Bloomberg files would have been XML; and

g.  a significantly large discrepancy between the numbers of email files produced by Enforcement and those known to exist, e.g., the Bloomberg files obtained.

52.      In a declaration dated July 30, 2014, Dustin Sachs, Managing Consultant with Navigant Legal Technology Solutions, noted that certain CDs/DVDs delivered by Enforcement contained permanent read errors and that anomalies, formatting, and content differences exist in data allegedly produced by Smarsh that are not present in the emails obtained from Bloomberg.

53.      Copies of the relevant Bloomberg vault emails were delivered to FINRA Regional Counsels Fernandez and Belter on or about August 8, 2014.

54.      On or about October 15, 2014 FINRA Regional Counsel Belter sent a letter by Federal Express (with proof of UPS delivery from Smarsh) stating: "…in the course of our investigation of the Respondents' allegations of spoliation, we learned that Smarsh, Inc. only provided FINRA Respondent [LK's] Bloomberg emails, not her Bloomberg instant messages."

55.      Mr. North questioned the origin, source, custody, integrity, and credibility of ESI received from FINRA and compliance review reports allegedly prepared by Smarsh ("Smarsh Reports"); then, on or about August 19, 2014, Smarsh representative Jimmy Douglas, authored

a letter to FINRA Examiner McKennedy purporting to validate Smarsh's archival services,[6]

which letter states in part:

> Smarsh provided Ocean Cross with *email hosting, which integrated with our email archiving platform*. Email was captured *using the journaling function*. Journaling ensures that all emails and attachments sent to, from or within a clients' domain are *instantly* placed in the archive. There is no window of opportunity for messages to be tampered with before they are sent to the archive.
>
> For Bloomberg archiving, *our solution interfaces with Bloomberg servers directly throughout each day*, capturing any new messages, blogs, or chats that have been sent or received by the users at a firm. Messages are fully indexed and *are stored in their respective XML formats with all attachments and metadata completely preserved*.
> …
> All searches performed, including criteria used, are recorded. Reports can be generated to show those searches performed. (Emphasis added.)

56.     Mr. Douglas also testified[7] at telephonic hearings on November 5 and 25, 2014

before Hearing Officer Carloni that Smarsh hosted the email service and server for Ocean Cross.

57.     Contrary to Mr. Douglas' testimony, however, FINRA Boston District Regional

Counsel Taberner had previously learned from CEO Schloth on April 23, 2012[8] and from copies

of invoices and like records that Web.com hosted the Ocean Cross email server and services.

58.     On December 8, 2014, Hearing Officer Sonnenberg noted:

> [T]the Hearing Officer finds that there are genuine issues as to certain material facts (or, at a minimum conflicting inferences that can be drawn from the facts) which preclude summary disposition. These genuine issues include: (1) whether there was a difference between the ESI (including the quantity of ESI) that Smarsh provided to Enforcement and the ESI that Enforcement produced to Respondents in discovery; and (2) to the extent that there was a difference, (a) what accounted for that difference; (b) did Enforcement alter, omit, or delete any ESI it received from Smarsh before producing ESI to

---

[6] The terms hosting, journaling, capturing, and archiving are terms of art specific to certain operations pertaining to the transportation and preservation of email communications.

[7] *See* Transcript of November 5, 2014 Hearing (In the Matter of Ocean Cross) at 66, 67, 69, and 71.

[8] *See* Transcript of Schloth Testimony (In the Matter of Ocean Cross) dated April 23, 2012 at 19.

Respondents and, if so, how and why did this occur and was it done intentionally or unintentionally.

59.     To address Hearing Officer Sonnenberg's concerns Plaintiffs contacted Berryhill

Computer Forensics, Inc. ("Berryhill") in December 2014; Berryhill tested and examined the

allegedly archived files and compared them with the Bloomberg files in February 2015 and

March 2015; although it was not confirmed at the time that Smarsh had not archived the

electronic communications files, Berryhill concluded:

> The data produced by Smarsh has been altered and manipulated to the point of being nearly unrecognizable when compared to the original source data. … date and time stamps that have been altered, sender and recipient header information changed, and body content altered or deleted. Overall, these give a misleading and false impression of the facts in this case. The errors and other problems I have highlighted in this report are not occasional occurrences found in only a few messages. *They are examples among hundreds of thousands of systematic and widespread failures in how Smarsh has collected, processed and produced the data for which they are supposed to be a neutral third party repository.*
> …
> The scope of spoliation of the emails is so broad that no information produced through Smarsh can be deemed reliable. This would include not only the header information and content of any message or groups of messages, *but also any reports or summaries derived from or referencing those messages. The multiple and repeated failures of Smarsh's processes leave me with no confidence in anything they produce.* (Emphasis added.)

*See* Declaration of Jon Berryhill dated March 2, 2015 ¶¶ 5, 24, attached as Exhibit 4.

60.     Berryhill also examined the two CDs/DVDs of Bloomberg files FINRA

Enforcement delivered with FINRA Counsel Belter's letter in October 2014; Berryhill noted:

> The flawed processing by Smarsh has led to even the most fundamental of errors in identifying evidence data types. … These two discs contain more than 9GB of data saved in PST format in 8 separate files. It was represented to me that FINRA was told by Smarsh that these two discs, produced by Smarsh, contained some 190,000 instant messages recovered from the Bloomberg archives, but that had some how been previously "overlooked."
>
> … I see nothing to indicate they are in any way "instant messages." All of the messages I have observed from these two DVDs are consistent in format …. I do note that in this case, *as with all the other instances of Bloomberg XML data being converted to PST*

> *format, that a substantial amount of information has been added that gives a false and misleading impression of the nature and form of these messages.* In Smarsh's processing, produced on the PSTs, they have added to the beginning of each (approximately 190,000) message body the text "BB Message". This text does not appear in the originals. (Emphasis added.)

*Id.* ¶¶ 20-21.

61.     At FINRA's request and to support certain Smarsh Reports, Smarsh witness Robert Sherman testified telephonically before Hearing Officer Sonnenberg at an evidentiary hearing on April 13, 2015 in New York City, New York, stating, "*The [Smarsh] [R]eports would be run off the message metadata …*" (emphasis added) and, further, that the Bloomberg database used to produce the Smarsh Reports was no longer available because it was lost to an unsuccessful data migration and attempt to re-ingest the files in *early* 2014, months before Smarsh allegedly located the files placed on the CDs/DVDs, which FINRA Regional Counsel Belter sent to Mr. North in October 2014.[9]

62.     On April 27, 2015, FINRA Examiner James McKennedy testified in Boston, Massachusetts about changing dates in certain Smarsh Reports to correct a "leap year" issue known to exist in non-Y2K compliant equipment and software, which are no longer lawful for use in compliance or financial industry transactions.

63.     On or about September 3, 2015 Smarsh General Counsel Page executed a declaration that confirmed Plaintiffs' belief at the time that Smarsh failed to provide regulatory compliance archiving; Ms. Page's declaration contradicted Mr. Douglas' November 2014 testimony regarding email services and archiving and contradicted Mr. Sherman's April 2015 testimony about file migration and re-ingestion:

> In order to archive email messages from an email system … the user of the email client must configure the server  … to copy messages to a journaling address. The journaling

---

[9] *See* Transcript of April 13, 2015 Hearing (In the Matter of Southridge) at 111.

address translates to an IP address … associated with an archive server to which the emails will be sent to be archived. … In *July 2014*, Smarsh decommissioned the server drives associated with sands.smarsh.com according to standard maintenance and technical operations and migrated any current customers to an alternate server. …

Huber could not "resolve" the sands.smarsh.com IP address because Smarsh decommissioned the servers…. Smarsh captured emails as they were sent because the email servers were configured to send a copy to sands.smarsh.com as well as the recipient. (Emphasis added.)

*See* Declaration of Bonnie Page, *North et al v. Smarsh et al*, 15-cv-00494, Dkt. 22-1, ¶¶ 4, 5, 10.

64.     In May 2015, Plaintiffs retained Frank Huber for his experience with network security, Y2K remediation, and XML; Mr. Huber noted:

My conclusion that Smarsh did not and could not have provided either archiving or journaling services comes from two (2) sources: the difference in the number of emails produced by Smarsh and FINRA to Messrs. North and Pompeo as compared to the number of emails known to exist between July 1, 2009 and December 13, 2012 and the pervasiveness of false positives. … [Further] the presence of four (4) distinct geographical locations in a set of emails for one (1) email domain and IP address is not possible for a public IP address, but rather demonstrates redirection of the emails to a "Private Collaborative Network", where the emails were moved around for alteration and spoliation and where one (1) email domain name and IP address can be changed or identified with multiple geographical locations within the network through the use of CIDR Range Values. …

Once the emails were [on] the Private Collaborative Network, they were under FINRA's control and discretion … I can only conclude that the technology available was used for fraudulent purposes … in legal proceedings and presented as though they were retrieved from an "archive". Because the emails were not archived but were redirected to a Private Collaborative Network where they were spoliated and altered, it would not have been possible for the email to be organized in a secure platform for compliance actions.…

I can state without any doubt that in the world of archiving and migration of files for archiving purposes it is impossible to lose the files that Smarsh controlled by the act of migration.  … one would have to intentionally delete the files for the intent of destroying the evidence in order to lose the files permanently.

The fact that there are many false positives found in the emails … leads me to conclude that FINRA and Smarsh worked in concert over an extended period. … The explicit and detailed instructions from Smarsh for IP address setups and the missing AES 256 encryption tags on non-FINRA produced emails constitute two (2) of the clearest pieces of evidence that FINRA and Smarsh collaborated in an effort to have emails redirected for spoliation and alteration.

*See* Declaration of Frank Huber dated December 22, 2015 ("Huber Declaration December 2015") ¶¶ 7, 12, 13, 15, marked Exhibit 5.

65.     At no time, since bringing concerns about the failed archive and the alteration of and tampering with the files to the attention of FINRA's Hearing Officers and Regional Counsels, have either Smarsh or FINRA located a complete archival copy of the Plaintiffs' or the Southridge or Ocean Cross firms' brokers' electronic communications, or explained the discrepancies in quantity, reasons for multiple non-native formats of the ESI, and the false positives that are contained throughout all copies of the CDs/DVDs sent to Mr. North.

66.     At no time as required by 17 C.F.R. § 240-17a-4(f)(ii) has Smarsh or FINRA provided any verifiable data compilations or any server audit logs, server event, or other like administrative activity logs used to prepare and intending to certify the Smarsh Reports containing compliance actions undertaken at the Southridge and Ocean Cross firms.

67.     Instead, at FINRA's request and with Smarsh General Counsel Page present, Smarsh employees Douglas and Sherman offered misleading and contradictory statements and testimony on August 19, 2014, November 5 and 25, 2014, and April 13, 2015, which statements and testimony were meant to conceal Defendants' conspiracies and actions towards Plaintiffs and their electronic communications and related compliance records.

68.     Due to Defendants' actions, Messrs. North and Pompeo have suffered loss of gainful employment and damage to their reputations; they have incurred costs and expenses for legal and consulting services to uncover Defendants' conspiracies; they and the firms, as an intended, direct benefit of employment, paid for archiving services that were not delivered.

69.     The cost for archiving Mr. North's electronic communications was a benefit paid for him by the Southridge and Ocean Cross firms; Mr. North was earning $120,000 per year as

CCO for Southridge prior to the FINRA proceedings; he now earns $500 per month, having obtained only part-time employment since the proceedings. Considering that Mr. North has seventeen years of gainful employment remaining, Mr. North's annual loss or reduction of income, beginning in September 2011 when Southridge closed, is believed to be $2.5 million.

70.     Prior to 2013, Mr. Pompeo was earning an average of $108,000 per year; after entering into an AWC with FINRA he lost his last employment in the securities industry and has since had irregular employment in non-industry sales positions for which he has no experience; considering that he has a remaining fifteen years of gainful employment, Mr. Pompeo's loss of income is believed to be $1,620,000; Mr. Pompeo paid $500 per month for archival services that Smarsh did not provide for a total of $16,500 from January 2010 through September 2012.

### COUNT I – CONSPIRACY TO COMMIT AND THE COMMISSION OF COMMON LAW FRAUD BY USE OF MAIL SERVICES
### (Common Law and Mail Fraud; 18 U.S.C. §§1341, 1346)

71.     Messrs. North and Pompeo incorporate by reference the allegations contained in paragraphs 1 through 70.

72.     A conspiracy is (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act or acts done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act(s) results in damage to the plaintiff.

73.     The five elements of common law fraud are: "(1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C. 1977); *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

74.     According to 18 U.S.C. §§ 1341, 1346, and 1349, it is unlawful to use and to attempt or conspire to use the United States mail or interstate commercial carrier services to execute a scheme or artifice to defraud, including schemes to deprive persons of the intangible right to receive honest services; for such schemes, Plaintiffs may be entitled to treble damages according to 18 U.S.C. §§ 1961 and 1964.

75.     The evidence shows that Defendants commenced their conspiracy to circumvent the regulatory compliance archiving requirements of 17 C.F.R. § 240.17a-4(f)(2)(ii)(A), as early as December 23, 2005 but before July 1, 2009;[10] after July 1, 2009, as described, Defendants communicated with each other, Plaintiffs, and other Southridge and Ocean Cross employees by mail and interstate carrier to convey representations, exchange information, perform actions, and deliver discs of data to keep up the appearance of archiving and compliance services.

76.     The evidence shows that between December 22, 2005 and January 8, 2015[11], Defendants used the United States mails and interstate commercial carriers, United Parcel Service ("UPS") and Federal Express, to send and receive CDs/DVDs containing ESI and to correspond with each other and Plaintiffs.

77.     Defendants' conspiracy required that FINRA identify target firms and individuals who used Smarsh for archiving and related compliance actions; then, upon receipt of the unlawfully intercepted electronic communications in the private collaborative network, FINRA agents and employees altered, tampered with, and changed critical compliance information in the electronic communications in ways known by FINRA employees to cause the electronic files to falsely appear to reflect, to infer, and to suggest securities law violations.

---

[10]  December 22, 2005 corresponds to Smarsh's first written contract for services to Southridge under its former name of Greenfield Capital Markets, LLC. *See* Exhibit 2. July 1, 2009 corresponds to the approximate date on which Southridge CEO Schloth hired LK.

[11] This date corresponds to the last delivery of discs from FINRA to Mr. North.

78.    Defendants' conspiracy required that Smarsh make and continue to make specific but false representations about and to enter into contracts for archiving and compliance services for firms and persons, like Plaintiffs, who were registered with firms not equipped to perform those services themselves, to obtain remote electronic access to Southridge Tech equipment to facilitate the interception and delivery of the electronic communications to the private collaborative network, and to take actions like conducting "tests" as if Smarsh were delivering archiving and compliance services that it did not intend to and in fact did not provide.

79.    Smarsh's representations, promises, and actions were false, but were intended to, and did in fact, induce the Southridge and Ocean Cross firms to negotiate and continue contracts for archival and compliance services specifically intended to benefit Plaintiffs, satisfy their duties to archive, and induce Plaintiffs' reliance, to their detriment, on the alleged services promised by Smarsh; due to Smarsh's representations and to their detriment, neither Plaintiffs nor other registered representatives with Southridge or Ocean Cross sought other third party vendors to provide archival services, other compliance services, redundancy, or backup records.

80.    By the nature of Smarsh's business, Smarsh knows or should know that firms like Southridge and Ocean Cross and individuals like Plaintiffs (a) would and did in fact reasonably rely upon Smarsh's alleged knowledge, expertise, promises, and representations made to them respecting Smarsh's archival and compliance solutions, and (b) would and did reasonably believe that Smarsh would exercise due and proper care in preserving their electronic business communications according to 17 CFR 240.17a-4(f)(2)(ii)(A), in a commercially reasonable manner in an accessible, properly searchable archival database for compliance purposes.

81.    By the nature of its business and consistent with its contracts for archiving services, Smarsh knows or should know that its preservation of the electronic communications is

22

intended to satisfy the firms' and individual registered representatives' compliance with the duties described in 17 CFR 240.17a-4(f)(2)(ii)(A); the archived records are intended to be the primary source of ESI relating to securities transactions undertaken by persons like Mr. Pompeo; the archive also intended to show compliance with securities laws in supervisory and compliance actions undertaken by persons like Mr. North.

82.    The actions taken by FINRA and Smarsh agents and employees circumvented the requirements of 17 C.F.R. § 240.17a-4, and rendered the digital files unusable and unsearchable.

83.    The intentionally altered, falsified, and tampered with records were designed to force Plaintiffs into non-compliance and create inferences of regulatory failures that allowed FINRA Enforcement to pursue legal actions against Mr. North and to fraudulently induce Mr. Pompeo to enter into an AWC.

84.    Carrying out and concealing the Defendants' conspiracy required knowledge and participation of persons at multiple locations and at various levels within FINRA and Smarsh; FINRA Regional Counsels solicited perjured testimony from Smarsh witnesses Douglas and Sherman; FINRA Examiners Jackson and McKennedy created and printed deceptive and false emails from altered, tampered with, reconstructed digital files for use in interviews and hearings; Hearing Officers avoided addressing challenges to the corrupted evidence.

85.    The interception of Plaintiffs electronic communications interfered with Plaintiffs' business operations and caused foreseeable harm to them by depriving them of the intangible right to the services of archiving their electronic communications; the interception deprived them of the original electronic communications files and prevented the creation of backup copies for the files.

86.     As a foreseeable, direct, and proximate cause of Defendants' conspiracies, Messrs. North and Pompeo were compelled to defend legal claims based wholly on tampered with and falsified records and to go to extraordinary efforts to obtain comparative data from other sources, thereby incurring professional and legal fees and costs in amounts not yet fully known, but believed to be in excess of $100,000.

87.     Plaintiffs contend it was foreseeable that each would be injured and suffer loss of employment and income and harm to their business reputations upon commencement and publication of FINRA proceedings and any settlement(s) based upon wrongfully altered, converted, and tampered with evidence.

88.     Considering the harm to his business reputation caused by Defendants' actions and that Mr. North has many remaining years of potential and gainful employment, he contends that his damages are no less than $2.5 million in lost income, fees, and other costs.

89.     Considering the harm to his business reputation caused by Defendants' actions and that Mr. Pompeo has many remaining years of potential and gainful employment, he contends that his damages are no less than $1,620,000 in lost income, fees, and other costs.

90.     Because Defendants' actions were conspiratorial, willful, unlawful, and intentional, Messrs. North and Pompeo are each entitled to punitive damages.

**COUNT II – CONSPIRACY TO COMMIT AND THE COMMISSION OF
COMMON LAW FRAUD USING WIRED AND WIRELESS MEDIA
(Wire Fraud; 18 U.S.C. §§1343, 1346)**

91.     Messrs. North and Pompeo incorporate by reference the allegations contained in paragraphs 1 through 90.

92.     According to 18 U.S.C. §§ 1343, 1346, and 1349, it is unlawful to use and to attempt or conspire to use wired and like media to execute a scheme or artifice to defraud,

including schemes that deprive persons of the intangible right to receive honest services.

93.     On multiple occasions between July 1, 2009 and October 2011 Smarsh and or FINRA communicated with Messrs. North and Pompeo over wired and wireless communication media, including their PCs, and Mr. North's iPhone and Mr. Pompeo's Blackberry; Smarsh employees communicated instructions to Plaintiffs for archiving set-up, which instructions were intentionally false, misleading, and contrary to regulatory compliance archiving protocols.

94.     Smarsh employees allegedly conducted "tests" and communicated test results by email using wired and wireless media on or about October 20, 2009, between February 12 and 19, 2012, and again, on or about March 23, 2012, to create the false appearance of successful tests of archival services; however, Smarsh's representations about testing the archive were false.

95.     Smarsh General Counsel Page's declaration of September 3, 2015 confirmed the conclusions drawn from the electronic communications and the metadata that none of Messrs. North's and Pompeo's emails were captured and archived; instead, business *and personal* electronic communications were intercepted in real time and directed over wired and wireless media to IP addresses associated with a private collaborative network where the electronic communication files were converted, lost, destroyed, altered, tampered with, and reconstructed by the Defendants' design and actions; none of Plaintiffs' electronic communications transported on the known sending and receiving email servers provided by Southridge Tech and web.com for Southridge and Ocean Cross, respectively.

96.     As described above, Messrs. North and Pompeo were foreseeably and harmfully damaged in amounts not yet fully ascertained, but believed to be no less than $2.5 million and $1,620,000, respectively, in lost present and future earnings and harm to their business reputations, plus other costs, expenses and fees incurred due to Defendants' actions.

97.     Because Defendants' actions were conspiratorial, willful, unlawful, and intentionally tortious, Messrs. North and Pompeo are each entitled to punitive damages.

## COUNT III – CONSPIRACY TO INTERCEPT AND THE UNLAWFUL INTERCEPTION OF ELECTRONIC COMMUNICATIONS
### (Violation of the Electronic Communications Privacy Act, 18 US.C. §§ 2510–2521, Connecticut Wiretapping and Electronic Surveillance Act, Conn. Gen. Stat. §§ 54-41a–54-41u; Massachusetts Interception of Wire and Oral Communications Act, Mass. Gen. Laws ch. 272, § 99)

98.     Messrs. North and Pompeo incorporate by reference the allegations contained in paragraphs 1 through 97.

99.     Messrs. North and Pompeo contend that FINRA and Smarsh agents and employees conspired to and knowingly violated 18 U.S.C. §§ 2510–2521, Conn. Gen. Stat. §§ 54-41a–54-41u (2015); Mass. Gen. Laws ch. 272, § 99 (2016), which prohibit (i) the unlawful, contemporaneous interception of electronic communications through electronic means or mechanical devices, (ii) the use of intercepted wire or oral communications as evidence, and (iii) the disclosure of such unlawfully intercepted communications. For such violations, Plaintiffs are entitled to civil damages according to 18 U.S.C. § 2520, Conn. Gen. Stat. § 54-r; Mass. Gen. Laws ch. 272, § 99Q.

100.     Instructions provided by Smarsh to Plaintiffs, Southridge Tech, and other individuals registered with Southridge and Ocean Cross, were not for the purpose of archiving as required by 17 C.F.R. § 240.17a-4(f)(2)(ii)(A), but rather, Smarsh intentionally, voluntarily, and purposefully intended the instructions to cause the intended result of and to facilitate by electronic means the unlawful, real time interception of Plaintiffs' business *and personal* electronic communications while in transmission, so that none of Plaintiffs' electronic communications transported on the known sending and receiving email servers.

26

101.    Defendants' actions, in violation of 18 U.S.C. § 2518, achieved an unlawful, intentional, voluntary contemporaneous interception of Plaintiffs' electronic communications without Plaintiffs' consent and without the application, under oath before a judge of competent jurisdiction, for a warrant or order approving the interception; Defendants' actions also violated Conn. Gen. Stat. § 54-41*l*; Mass. Gen. Laws ch. 272, § 99E–F.

102.    Upon receipt of the intercepted electronic communications in the private collaborative network, Defendant FINRA agents and employees processed, altered, tampered with, reconstructed, and then used and disclosed the unlawfully obtained and processed electronic communications as evidence with the knowledge that the electronic communications were unlawfully intercepted in violation of 18 U.S.C. § 2515; the interception and use also violated Conn. Gen. Stat. § 54-41*l* and Mass. Gen. Stat. ch. 272, § 99C.

103.    The ECPA, 18 U.S.C. § 2520(c)(2) authorizes the recovery of civil damages against the individual or entity violating the law; the court may assess damages equivalent to "the sum of actual damages suffered by the plaintiff and any profits made by the violator" of the ECPA or statutory damages or $100 per day for each day of violation or $10,000. Conn. Gen. Stat. § 54-41r and Mass. Gen. Laws ch. 272, § 99Q each provide for actual damages or statutory damages of 100 per day for each day of violation or $1,000, "whichever is higher; punitive damages; and a reasonable attorneys fee and other litigation costs reasonably incurred."

104.    As described above Messrs. North and Pompeo were foreseeably and harmfully damaged in amounts not yet fully ascertained, but believed to be no less than $2.5 million and $1,620,000, respectively, in lost present and future earnings, harm to their business reputations, and for other costs and fees incurred.

## COUNT IV – CONSPIRACY TO COMMIT AND THE CONVERSION OF ELECTRONIC DATA
### (Common Law Conversion of Electronic Data)

105.    Messrs. North and Pompeo incorporate by reference the allegations contained in paragraphs 1 through 104.

106.    Plaintiffs contend that Defendants' actions are a civil conspiracy to commit the tort of conversion of electronic data, which requires that (i) a party own or have the right to possess tangible or intangible personal property, in this case electronic communication files, (ii) the tortfeasor intentionally interferes with the party's possessory rights to the property and deprives the party of possession or use of the property, and (iii) the conversion caused harm or damage to the plaintiff(s). *See Thyroff v. Nationwide Mut. Ins. Co*., 8 N.Y.3d 283, 864 N.E.2d 1272, 1277-78 (2007) (Second Circuit certified question to New York Court of Appeals; Held: "whether the tort is called conversion, or a similar tort with another name…. A document stored on a computer hard drive has the same value as a paper document kept in a file cabinet.")

107.    Smarsh CEO Stephen Marsh stated on or about February 9, 2006, *see* Exhibit 1, that the individual brokers registered with firms for whom Smarsh provides archiving services, own or have the right to possess their electronic communication files; Smarsh employees communicated and corresponded directly with Plaintiffs (and other Southridge and Ocean Cross employees) about alleged archiving for their electronic communications.

108.    Plaintiffs contend that Defendants conspired to and intentionally interfered with their right to own and possess their electronic data, without Plaintiffs' knowledge or consent, by intercepting and directing the files in real time to a private collaborative network not owned or controlled by Smarsh, where their original electronic communications were tampered with, altered, lost, and destroyed by Defendants' actions and arrangements.

109.    Because Smarsh intentionally did not archive Plaintiffs' electronic communications files as it contracted to do, but instead, by instruction and other admitted failures and actions, facilitated the unlawful interception and conversion of the files, Smarsh's actions were an extreme and unlawful departure from any standard of ordinary care and contrary to its contractual duties to Plaintiffs.

110.    Smarsh witnesses offered and provided deceptive statements and testimony in the effort to fraudulently conceal Defendants' unlawful conversion of Plaintiffs' electronic files.

111.    The direct and foreseeable injury to Plaintiffs due to Defendant Smarsh's breaches of duties is that the original electronic communication files were lost or destroyed by Defendants' combined actions and no longer exist; therefore, Defendants' conduct deprived Plaintiffs of the digital files and the intangible right of self-protection.

112.    As described above Messrs. North and Pompeo were foreseeably and harmfully damaged in amounts not yet fully ascertained, but believed to be no less than $2.5 million and $1,620,000, respectively, in lost present and future earnings, harm to their business reputations, and for other costs and fees incurred.

113.    Because the actions of Smarsh and FINRA were deceptive, intentional, willful, and unlawful, Messrs. North and Pompeo are entitled to punitive damages.

## COUNT V – COMMON LAW BREACH OF CONTRACT

114.    Messrs. North and Pompeo incorporate by reference the allegations contained in paragraphs 1 through 113.

115.    Messrs. North and Pompeo were intended third party beneficiaries of contracts executed by the Southridge and Ocean Cross firms with Smarsh containing promises for

regulatory compliance archiving towards the Plaintiffs' electronic communications files and recording compliance actions for supervision.

116.    Smarsh employees gave instructions to Plaintiffs that were contrary to industry practices and procedures for regulatory compliance archiving and that were a willful breach of specific promises made and resulted in breaching the contract for electronic communications archiving and compliance services for Plaintiffs' intended, direct benefit.

117.    Smarsh witnesses provided deceptive statements and testimony at the request of FINRA Enforcement staff in order to fraudulently conceal Defendants' conspiracy and the circumstances of Smarsh's actions that breached the archiving and compliance services contracts entered into in 2005, 2007, and 2011 for the intended, direct benefit of Plaintiffs.

118.    As a direct, foreseeable damage due to Smarsh's bad faith and willful breach of contract, Messrs. North and Pompeo were deprived of the promised archiving and related compliance services, and records of those services that were intended for Plaintiffs' benefits.

119.    Mr. Pompeo paid $500 per month for archival services between January 2010 through September 2012 that Smarsh did not provide, for a loss of $16,500; the cost of archiving services for Mr. North were provided as a benefit of his employment with the Southridge and Ocean Cross firms, and therefore his loss is of comparable value to be proven at trial.

120.    As a foreseeable injury of Smarsh's breach of contract, Messrs. North and Pompeo incurred consequential damages in the form of expenses for obtaining copies of comparable electronic communications files from other sources, fees in consulting professionals, and the fees and costs defending legal claims derived from and directly related to the failure of the archive and the condition of the electronic communications files, in amounts to be proven at trial but believed to be no less than $100,000.

WHEREFORE, Messrs. North and Pompeo pray for:

a.   Judgment against Defendants Smarsh and FINRA and findings that their agents and employees engaged in intentional, tortious, and unlawful conduct as described;

b.   Award to each lost present and future wages, in amounts to be proven at trial;

c.   Award to Mr. Pompeo reimbursement for costs associated with archiving;

d.   Award to each the costs associated with hiring consultants and obtaining comparative electronic communications files in amounts to be proven at trial;

e.   Award to each punitive damages using a reasonable multiplier applied to actual present and reasonable future economic and related damages;

f.   Award to each their reasonable attorneys fees and reasonable litigation costs; and

g.   Other legal and equitable relief as may be authorized by statute and appropriate under the circumstances.


Respectfully submitted,

**THADDEUS J. NORTH and
MARK P. POMPEO**

By: ***/s/ Constance J. Miller***
Constance J. Miller, DC# 499445
P.O. Box 125
Falls Church, VA 22040-0125
Phone: (202) 657-2599
Cjmiller1951@me.com

## JURY DEMAND

Plaintiffs demand trial by jury as to all issues that are triable.

## APPENDIX OF INITIALS

The following acronyms are used in the forgoing pleading:

LK = Leslie King
TC = Todd Cowle

## EXHIBITS

| | |
|---|---|
| 1 | Whois-RWS for IP 172.17.161.22 |
| 2 | Smarsh Contracts |
| 3 | February 9, 2006 Letter from Stephen D. Marsh |
| 4 | Declaration of Jon Berryhill dated March 2, 2015 |
| 5 | Declaration of Frank Huber dated December 22, 2015 |